# UNITED STATES DISTRICT COURT
# DISTRICT OF NORTH DAKOTA

Piper Mitchell,

    Plaintiff,

v.

Sanford Health,

    Defendant.

Case No.: _____

**COMPLAINT AND JURY DEMAND**

Plaintiff Piper Mitchell ("Plaintiff" or "Ms. Mitchell"), for her Complaint against Sanford Health ("Defendant" or "Sanford"), states and alleges as follows:

## NATURE OF CLAIM

1. Plaintiff brings this action to remedy illegal interference, retaliation, and discrimination in violation of the Employee Retirement Income Security Act (ERISA), Family and Medical Leave Act (FMLA), Americans with Disabilities Act (ADA), and Title VII of the Civil Rights Act of 1964 (Title VII).

## PARTIES, JURISDICTION & VENUE

2. Ms. Mitchell is a citizen and resident of North Dakota.

3. Defendant is a Nonprofit Corporation that does business in North Dakota.

4. At all relevant times, Plaintiff and Defendant were "employee" and "employer," respectively, as those terms are defined in 29 U.S.C. § 1002, 29 U.S.C § 2611, 42 U.S.C. § 12111, and 42 U.S.C. § 2000e.

1

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

6. This Court has jurisdiction over the parties because Plaintiff is a resident of North Dakota and Defendant is doing business in the State of North Dakota.

7. Venue is proper in this Court because the unlawful and retaliatory practices alleged herein occurred in North Dakota.

8. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission regarding the conduct alleged herein and received a Notice of Right to Sue. Plaintiff has satisfied all administrative prerequisites to bringing this action.

## FACTS

9. In 2021, Defendant hired Plaintiff as a full-time, salaried inpatient pharmacist at the South University campus.

10. Defendant reassigned her to the West Fargo campus in September 2022.

11. In late 2022, Plaintiff became pregnant with her first child, H.M.

12. In December 2022, Plaintiff learned that her unborn child suffered a rare and devastating congenital heart defect, Hypoplastic Left Heart Syndrome (HLHS).

13. HLHS is a congenital heart defect in which the left ventricle is severely underdeveloped and non-functional.

14. Children born with HLHS require a series of complex and high-risk surgeries for the child to have any chance of survival.

15. Despite intervention and intense medical care, approximately 50% of children born with HLHS do not live past their first birthday.

16. During this time, Plaintiff also began experiencing severe physical and mental health symptoms, including depression and suicidal ideation.

17. During this time, Plaintiff took an FMLA-approved medical leave of absence to attend to both her and her baby's serious health conditions.

18. Plaintiff's baby, H.M., was born in March 2023.

19. H.M. was immediately transferred to the Cardiovascular Intensive Care Unit (CVICU) and underwent open-heart surgery at only three days old.

20. Over the next 55 days, H.M. endured multiple life-threatening complications including, cardiac arrests, life support, and numerous invasive procedures.

21. H.M. survived these intensive medical interventions and was discharged from the hospital on or around May 23, 2023.

22. As an employee of Defendant, Plaintiff and her family were covered under Defendant's self-funded health plan.

23. Defendant, as the employer and plan administrator, bore the financial responsibility for the costs of H.M.'s medical care.

24. During H.M.'s first year of life, Defendant paid approximately $3,000,000 for H.M.'s treatment.

25. Plaintiff returned to work after her son's discharge.

26. In February 2024, Plaintiff learned she was pregnant with her second child.

27. Prior to her second pregnancy, Plaintiff sought leading experts who reassured her time and time again that her next child would only have about a 2% chance of being born with HLHS.

28. On the same day Plaintiff learned of her pregnancy, her health care provider told her she had dilated cardiomyopathy—an enlargement of the heart that, in Plaintiff's case, signaled the early stages of heart failure.

29. After receiving the news, Plaintiff immediately notified her supervisor and requested a day off to address the emotional impact of the diagnosis.

30. In July 2024, Plaintiff attended a routine medical appointment with Maternal-Fetal Medicine. At that appointment, and despite the odds, Plaintiff received the news that her second child was also diagnosed with HLHS and would have less than a 50% chance of living to their first birthday.

31. Plaintiff shared the devastating news with her supervisor, Kristen LeClair. Plaintiff explained that once the baby was born, she would need extensive time off from work as FMLA and other protected leave to care for her medically fragile newborn, as she did when her first son was born.

32. Ms. LeClair then shared this information with Plaintiff's manager, Katie Galbreath.

33. Meanwhile, Plaintiff applied for a remote position with Defendant that she believed would better accommodate her family's needs.

34. When Plaintiff raised her idea with Ms. Galbreath, she was discouraged from applying. Ms. Galbreath informed Plaintiff that remote work was only permitted in "special circumstances."

35. Plaintiff responded by pointing out an employee who was allowed to work from Texas to be with her boyfriend. Ms. Galbreath responded by claiming that employee's situation was "different."

36. Plaintiff then informed Ms. Galbreath that the ICU would be her home for the foreseeable future and that she would be able to accomplish her work from that location.

37. Ms. Galbreath responded that Plaintiff could not, in her words, "just go on vacation and work remotely."

38. On or around August 22, 2024, just weeks after Plaintiff's conversation regarding remote work with Ms. Galbreath, Plaintiff was summoned to a meeting with Ms. Galbreath and Vicki Manske, Human Resource Representative.

39. In this meeting, Plaintiff was confronted, for the first time, with allegations of time entry discrepancies.

40. Defendant alleged discrepancies between Plaintiff's building badge swipes and manual time entries submitted through Defendant's timekeeping system.

41. These entries were always reviewed and approved by Plaintiff's supervisor.

42. Plaintiff explained the time entries were based on consistent and transparent rounding practices, permitted by the system itself, and that she always fulfilled the full hours of her shifts. Plaintiff further emphasized that she routinely made up any slight delays by staying late, ensuring that the total hours worked—and for which she was paid—were accurate. Plaintiff explained that all pharmacists operated this way with their schedules, and she had not been told to do otherwise. Importantly, Plaintiff noted no timekeeping concerns were ever brought to her attention.

43. Plaintiff even suggested Ms. Manske review camera recordings to substantiate her hours, to which Ms. Manske refused.

44. Plaintiff was shocked by the allegations and could not understand why she was being attacked for something that had never been an issue in the past.

45. Plaintiff then asked if Ms. Manske was aware of her son's medical condition and current pregnancy.

46. Ms. Galbreath confirmed that both she and Ms. Manske were aware of Plaintiff's circumstances.

47. Plaintiff sensed she was being set up for possible termination. At the time, Plaintiff was already under extraordinary strain. Her older son was living with a severe, life-threatening heart condition that would ultimately require a transplant; she herself had recently been diagnosed with heart failure; and her unborn child had been diagnosed with the same critical condition that had nearly taken H.M.'s life.

48. The prospect of losing her job under these circumstances caused Plaintiff's mental health to deteriorate rapidly. Plaintiff was already managing her own serious medical condition, caring for a medically fragile child, and preparing for the birth of another child with the same life-threatening diagnosis. The threat that she could lose her employment and the health insurance on which her family depended placed overwhelming pressure on Plaintiff's mental and emotional well-being.

49. Plaintiff informed Ms. Galbreath that she was struggling and that the cumulative stress of these circumstances was taking a serious toll on her well-being.

50. On August 27, 2024, Plaintiff received a text message from Ms. Galbreath requesting a meeting with Human Resources to follow up on the prior week's discussion.

51. Plaintiff responded, disclosing that she had been experiencing severe mental health challenges, and, given her condition, requested that her husband be allowed to attend the meeting for support.

52. Plaintiff's request was denied.

53. Plaintiff's health deteriorated rapidly, and she began experiencing acute thoughts of self-harm.

54. Plaintiff's husband immediately brought her to the emergency room. Plaintiff was admitted to the psychiatric unit at Prairie St John's Hospital, where she remained under inpatient care for three days.

55. Plaintiff's husband notified Ms. Galbreath of her hospitalization.

56. Ms. Galbreath responded that the meeting with Human Resources would be rescheduled.

57. Just days after Plaintiff was released from the hospital and seeking to return to work, Plaintiff attended the rescheduled meeting with Human Resources on September 4, 2024. Plaintiff's employment was terminated.

58. Defendant gave "falsification of time records" as reason for her termination.

59. Plaintiff was given no prior warning of the possibility of termination.

60. Plaintiff was given no chance to address or resolve the alleged discrepancies.

61. Plaintiff explained the medical and personal hardships she and her family were enduring and her willingness to comply with any timekeeping expectations moving forward.

62. Defendant disregarded her statement and instead proceeded with the termination.

63. As a result, Plaintiff's employer-sponsored health insurance was also terminated.

64. Plaintiff's health insurance was vital to her own care, her son H.M.'s treatment, and her unborn child.

65. Weeks after the loss of her employment, Plaintiff gave birth to her second son, A.M.

66. Immediately after his birth, A.M. was transferred to the CVICU to prepare for life-saving open-heart surgery on November 12, 2024.

67. In the days and weeks that followed, A.M. continued to undergo intensive medical intervention, including multiple emergency surgeries. For example, A.M. experienced heart rhythm issues which caused him to be placed on life support shortly after the surgery. A.M. then developed a total aortic occlusion, experienced kidney failure, and underwent an emergency bowel resection surgery.

68. Despite the circumstances, A.M. continued to prevail.

69. However, on February 25, 2025, A.M. suffered a heart attack and went into cardiac arrest. A.M. required extreme life-saving measures, but ultimately experienced severe damage to his heart.

70. A.M. passed away on February 26, 2025.

71. Plaintiff was denied healthcare benefits to which she was entitled.

72. Plaintiff was terminated for utilizing benefits to which she was entitled.

73. Defendant prevented Plaintiff from utilizing her FMLA leave.

74. Plaintiff was terminated because of her request for FMLA leave.

75. Plaintiff was discriminated against for her association with her disabled sons.

76. Plaintiff was discriminated against for her own disability.

77. Plaintiff was retaliated against for seeking a reasonable accommodation.

78. Plaintiff was discriminated against because of her sex.

79. Defendant's articulated reason for taking adverse action against Plaintiff is pretext for unlawful retaliation.

## COUNT I
## VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff realleges each and every paragraph of this Complaint.

80. Defendant violated Plaintiff's rights under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*. These practices include, but are not limited to, interfering with Plaintiff's right to future ERISA benefits and retaliating against Plaintiff for usage of ERISA benefits.

81. Defendant's self-funded healthcare plan is an employee benefit plan that is governed by ERISA.

82. Under the terms of the healthcare plan, Plaintiff was entitled to receive covered costs for Plaintiff and her children's medical care.

83. Plaintiff was likely to receive future benefits to cover the costs for the birth of her second son, A.M.

84. Defendant terminated Plaintiff's employment because she intended to utilize the future benefit to which she was entitled.

85. Defendant interfered with the future benefits to which Plaintiff was entitled by terminating her employment.

86. Plaintiff exercised a protected right when she utilized her health benefits plan provided by Defendant to cover the $3 million in costs for medical care for her first son, H.M.

87. Defendant terminated Plaintiff for exercising this protected right.

88. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## COUNT II
## VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

89. Defendant violated Plaintiff's rights under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.* These practices include, but are not limited to, interfering with Plaintiff's right to medical leave and discriminating against Plaintiff because she asserted rights and/or sought benefits and protections under the FMLA.

90. Plaintiff sought FMLA leave on multiple occasions, including to care for her child and unborn child diagnosed with a life-threatening condition.

91. Defendant interfered with Plaintiff's FMLA leave by, inter alia, terminating her employment prior to Plaintiff taking FMLA leave despite Defendant's knowledge of her need for leave.

92. Defendant discriminated against Plaintiff for seeking FMLA. This discrimination includes, but is not limited to, terminating her employment.

93. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## COUNT III
## ASSOCIATIONAL DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

94. Defendant discriminated against Plaintiff because of her association with a disabled person, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq*. The ADA prohibits, among other things, the discharge or discrimination of an employee because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

95. Plaintiff's children were disabled persons.

96. Plaintiff's children had a record of disability.

97. Defendant regarded Plaintiff's children as having a disability.

98. Plaintiff's children were substantially limited in major life activities and bodily functions, such as, for example and not limited to, severely limited heart function resulting from Hypoplastic Left Heart Syndrome (HLHS).

99. Defendant's decision to terminate Plaintiff's employment was on the basis of her children's disability.

100. Defendant's actions were intentional and performed with malice and/or reckless indifference to Plaintiff's rights under the ADA.

101. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## COUNT IV
## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

102. Defendant discriminated against Plaintiff because of her disability, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq*. The ADA prohibits, among other things, the discharge or discrimination of an employee because of the employee's disability.

103. Plaintiff was a qualified disabled person.

104. Plaintiff had a record of disability.

105. Defendant regarded Plaintiff as having a disability.

106. Plaintiff was substantially limited in major life activities and bodily functions, such as, for example and not limited to, limited heart function, as well as a mental health condition that substantially impacted her ability to think, sleep, interact with others, and concentrate.

107. Defendant's decision to terminate Plaintiff's employment was on the basis of her disability.

108. Defendant's actions were intentional and performed with malice and/or reckless indifference to Plaintiff's rights under the ADA.

109. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## COUNT V
## RETALIATION IN VIOLATION OF THE
## AMERICANS WITH DISABILITIES ACT

Plaintiff re-alleges each and every paragraph of this Complaint.

110. Defendant retaliated against Plaintiff in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq*. The ADA prohibits, among other things, discrimination or retaliation against employees for exercising their rights under the ADA.

111. Plaintiff requested reasonable accommodation for her disability.

112. Plaintiff's request for accommodation included, but was not limited to, taking a leave related to her disabling health conditions.

113. Defendant retaliated against Plaintiff because she sought reasonable accommodation, including but not limited to, terminating her employment.

114. Defendant failed to take all reasonable steps to prevent retaliation from occurring.

115. Defendant's actions were intentional and performed with malice and/or reckless indifference to Plaintiff's rights under the ADA.

116. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## COUNT VI
## SEX DISCRIMINATION BASED ON PREGNANCY IN VIOLATION OF TITLE VII

Plaintiff re-alleges each and every paragraph of this Complaint.

117. Plaintiff was an employee of Defendant within the meaning of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*

118. Defendant terminated Plaintiff's employment because of her sex in violation of 42 U.S.C. §§ 2000e-2(a).

119. Defendant failed to take all reasonable steps to prevent discrimination from occurring.

120. Defendant's actions were intentional and performed with malice and/or reckless indifference to Plaintiff's rights under the Title VII.

121. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial lost income and benefits, lost career opportunities and job security, mental and emotional anguish and suffering, humiliation, embarrassment, and loss of enjoyment of life, and other damages. Plaintiff has also incurred expenses, legal costs and attorneys' fees, and other serious damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a. That the practices of Defendant complained of herein be adjudged, decreed and declared to be in violation of the rights secured to Plaintiff under applicable federal laws.

b. That a permanent prohibitory injunction be issued requiring Defendant to adopt employment practices in conformity with the requirements of federal law.

c. That Defendant be required to make Plaintiff whole for its adverse, retaliatory and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

d. That Plaintiff be reinstated to her job.

e. That Plaintiff be awarded front pay and the monetary value of any benefits she would have been entitled to as an employee of Defendant.

f. That Plaintiff be awarded compensatory damages in an amount greater than $50,000, to be determined at trial.

g. That the Court award Plaintiff her reasonable attorneys' fees, costs and disbursements pursuant to federal law.

h. That the Court grant such other and further relief as it deems fair and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS**

Dated: 3-5-2026

**KITZER ROCHEL, PLLP**

*/s/ M Kitzer*

Phillip M. Kitzer, MN No. 390441
225 South 6th Street, Suite 1775
Minneapolis, MN 55402
Tel. 612-767-0520
Fax 612-444-8890
kitzer@kitzerrochel.com

**ATTORNEYS FOR PLAINTIFF**

**WOLD JOHNSON, P.C.**

Benjamin E. Thomas
500 2nd Avenue North, Suite 400
Fargo, ND 58102
Tel. 701-235-5515
bthomas@woldlaw.com